IN THE UNITED STATE DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 3:06-CR-102 |
| ) | (Varlan / Guyton) |
| V. ) | |
| ) | |
| WILLIAM JORDAN, et al., ) | |
| ) | |
| Defendant. ) | |

## **REPORT AND RECOMMENDATION**

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. This matter came before the Court on March 22, 2007, for an evidentiary hearing on defendant William Jordan's Motion to Suppress and Request for Disclosure of Pertinent Reports, [Doc. 63].¹ Mr. Jordan was present in the courtroom along with his attorney, Mark Sallee. Assistant United States Attorney Hugh B. Ward, Jr. was present on behalf of the government. Drug Enforcement Administration (DEA) Special Agent David Lewis was also present, but did not testify. The Court received testimony from Investigator Gene Beard of the Atlanta Police Department; seven exhibits were introduced to the record; and arguments were made by Attorney Sallee and AUSA Ward. The Court took this matter under advisement March 23, 2007. The facts adduced at the evidentiary hearing are as follows.

---

¹ This suppression hearing was conducted immediately after the Court addressed a joint motion to continue the trial date and for designation of this case as complex for purposes of the Speedy Trial Act, 18 U.S.C. § 3161, et seq.; both motions were granted, see Memorandum and Order at [Doc. 137].

# I. FACTS

On August 1, 2006, a grand jury seated in the Eastern District of Tennessee issued an indictment charging William "Capers" Jordan in a conspiracy to distribute marijuana. Mr. Jordan was not immediately apprehended. On October 26, 2006, Atlanta DEA Drug and Violent Crime Task Force ("Task Force") agents accompanied Special Agent David Lewis of the Knoxville DEA office, Agent Lewis' partner, and an Internal Revenue Service Agent from Knoxville, to arrest Mr. Jordan at a house in Atlanta: 2164 Collins Drive, NW. One member of this arrest team was City of Atlanta Police Department Investigator Gene Beard. Investigator Beard was first assigned to the Atlanta Task Force in 1994.

Investigator Beard went to the house at 2164 Collins Drive, NW with the other law enforcement agents to make the arrest at about 10:00 or 10:15 a.m.. Investigator Beard testified that Agent Lewis and another officer approached the front door of 2164 Collins Drive, NW. Investigator Beard went to the backyard as a precaution, in case someone fled out the back door. Investigator Beard testified that the house had a carport on one side. The carport was separated from the house by a "little fence" and a gate at the rear.

Investigator Beard testified that he went through the gate and into the backyard, along with another officer. These two officers took up positions on either side of the backyard to watch for anyone attempting to flee the house. From the spot where he was posted, Investigator Beard saw what he described first as a glass sunroom with a door leading to the outside. Investigator Beard alternatively described the place as a storage unit with large glass panels. Investigator Beard testified that he looked through a window into this room and saw what appeared to be marijuana plants hanging from the ceiling.

Investigator Beard identified a series of photographs as they were introduced as exhibits to the hearing. Investigator Beard testified that exhibit 1 was a picture, taken after the fact, depicting what he saw at 10:30 a.m. through the window. The other photographs were identified described as showing a horticultural grow lamp on a shelf in the storage room at the rear of the carport; a grinder evidently used for processing marijuana for consumption, a plastic bag and razor visible through a window on the washroom; and a marijuana smoking apparatus fashioned from a sports drink bottle, also seen through the window of the storage room. Exhibits 2, 3 and 4. When no one answered the door for the arrest team, officers concluded that no one was at home. They then set up "a perimeter" to wait for Mr. Jordan to return.

At about 12:00 noon, a white pick-up truck pulled into the driveway, followed by a marked police car assisting the arrest team. Driving the truck was William Jordan. He had with him a small child, who Investigator Beard estimated to be about 2 or 3 years old, in a car seat in the truck. Investigator Beard testified that Agent Lewis arrested Mr. Jordan from the truck and took him though the carport gate to a patio area. Investigator Beard explained that Mr. Jordan "did not want to deal with the situation in front of the child." As Agent Lewis arrested Mr. Jordan, he saw a marijuana pipe in the floorboard of the truck.

In the backyard, Agent Lewis reiterated to Mr. Jordan that he was under arrest and then "gave him the opportunity to cooperate." Agent Lewis then asked for consent to search the house. Mr. Jordan declined. Investigator Beard then went to the Fulton County Superior Court to apply for a search warrant. Investigator Beard testified that he drafted the affidavit in support of the search warrant and presented it to the judge. Investigator Beard testified that all the facts contained within the affidavit were taken from his own personal knowledge and information provided by Agent

3

Lewis. The search warrant and underlying documentation were introduced as exhibit 5.

On cross-examination, defense counsel elicited some additional facts for the Court's consideration. Investigator Beard testified that he went to 2164 Collins Drive, NW three times on October 26, 2006. Initially, he drove by the house alone at about 9:45 or 10:00 a.m., so that he could be sure of where the group was going after they assembled. When he drove past the house the first time, Investigator Beard saw two vehicles, an older model blue Mercury and a white pick-up truck believed to belong to Mr. Jordan, in the driveway, but did not check the license plates.

As to the initial visit to 2164 Collins Drive, NW by the arrest team, Investigator Beard gave more detail about his sighting of marijuana and drug paraphernalia inside Mr. Jordan's house. Investigator Beard testified that he took up his position in the back yard before Agent Lewis approached the front door to knock. Investigator Beard explained that he wanted to get there before the knock in case anyone ran out of the house. Investigator Beard testified that he and the other members of the arrest team were not in a rush or hurry as they were there to serve an arrest warrant only, in contrast to the air of urgency that might surround execution of a search warrant.

Investigator Beard testified that he was "right by" the window when he looked inside and that he was about 10 feet past the breezeway connecting the carport to the house. Investigator Beard recalled that he "glanced to my left" and looked right into the window. It was then that he saw the marijuana, Investigator Beard testified.

Attorney Sallee then approached Investigator Beard with a hand-drawn diagram of the area surrounding the house. Using the diagram, Investigator Beard identified specific locations described in his testimony. Investigator Beard labeled the house itself with a letter A, the carport with a letter B and labeled the washroom. Investigator Beard marked with initials Investigator Beard the place

4

where he stood when he first observed the contraband through the window. The diagram was then introduced as exhibit 6 to the hearing.

Returning to the chronology of events that morning, Investigator Beard testified that he obtained a search warrant for the house after Mr. Jordan was arrested. Investigator Beard recalled this happened around 12:00 noon, clarifying that Mr. Jordan must have been arrested between 11:45 a.m. and noon. Investigator Beard said that he first noticed the items around 10:15 or 10:30 a.m., and that they were still there when Mr. Jordan was arrested.

Investigator Beard testified that he prepared his affidavit in support of the search warrant request in his car. After Attorney Sallee drew the witness' attention to inconsistency between his testimony and his recitation of events in that affidavit, Investigator Beard explained that the events as set forth in the affidavit did not reflect the actual, chronological sequence of events as they had occurred. In the affidavit in support of the search warrant, Investigator Beard said:

> At approximately 12:00 p.m. JORDAN arrived at the residence in a White Ford Ranger pickup truck. Agents approached JORDAN as he exited the vehicle and identified the subject to be in fact William Capers JORDAN. JORDAN was placed into custody at which time agents observed a marijuana pipe in the floor board of the vehicle. Agents observed thru [sic] a window of the residence a grow lamp, which is used to grow marijuana indoors and several plants believed to be marijuana drying in the residence.

Affidavit of Gene Beard, exhibit 5, [Doc. 63-2] at ¶ 3 [emphasis in original].

Investigator Beard testified that his description of the events before this Court was the accurate of the two. Investigator Beard acknowledged that the placement of the information that "Agents observed thru [sic] a window of the residence a grow lamp, which is used to grow marijuana indoors and several plants believed to be marijuana drying in the residence" immediately after the description of Mr. Jordan's arrest might suggest that the observations were made after the arrest.

5

Continuing on cross-examination, Investigator Beard testified that the first of the items he saw was the marijuana hanging to dry. He said that he thought it was marijuana, but did not know for certain at that point. Investigator Beard testified that, in fact, he made this observation before the arrest and before the discovery of the marijuana pipe in the truck. Investigator Beard said that he had initially looked into the window for his own immediate safety, in case someone was inside the house. Two doors led from the house into the backyard; another door led from the basement to the backyard. There was one other agent with Investigator Beard in the backyard.

Investigator Beard testified that he did not physically observe the front door knock, as he was already at the rear of the house by then. He could not estimate how long he was in the backyard. When asked whether he called over another officer to look into the window and confirm his sighting, Investigator Beard testified that he did not. When asked whether it might have been important to corroborate his discovery, Investigator Beard testified, "No, I know what I saw." Investigator Beard estimated there were about eight officers on the scene of the arrest.

## II: LAW

### A. Defendant's Position

Mr. Jordan's position is that the initial police observation of marijuana through the window of his house was in violation of his Fourth Amendment right to be free from unreasonable searches and seizures. Anticipating the government's argument that the Fourth Amendment does not prohibit a warrantless seizure of evidence of a crime in plain view, Mr. Jordan argues that the facts do not support application of the plain view doctrine, relying principally on Horton v. California, 496 U.S. 128 (1990). Mr. Jordan argues that Investigator Beard was not lawfully located in a place from where the objects could be seen when he spotted the marijuana and drug-related items.

6

In his argument at the close of the evidentiary hearing, Attorney Sallee told the Court that Mr. Jordan's motion to suppress, as written, presumed the search warrant affidavit contained the government's version of the actual chronology of events surrounding the arrest. Speculating that Investigator Beard's testimony had been "tweaked" in response to Mr. Jordan's motion to suppress, Attorney Sallee nonetheless addressed the facts as presented at the hearing. Although the testimony at the hearing established a different sequence of events than that suggested by the affidavit, Mr. Jordan maintained that the officer was not in a position to lawfully view the marijuana when he peered into the window. Counsel for Mr. Jordan maintained that, considering either the 10:15 a.m. visit or the 12:00 visit, the police "had no right to walk up and look into the windows."

### B. Government's Position

The government argued that Investigator Beard was in a lawful position to view the marijuana while assisting other officers in serving an arrest warrant. The government asserts that this was true for both the initial 10:15 a.m. trip to the house when no one was found at home, as well as for the 12:00 trip to the house that resulted in Mr. Jordan's arrest. The government relies solely on the plain view doctrine in support of Investigator Beard's observations.

### C. Analysis

The Supreme Court has articulated two principal requirements for a valid ;4827;4827plain view search: first, the incriminating nature of the item in ;4838;4838plain view must be immediately apparent, and second, the officer must be lawfully located in a position from which he or she can plainly see the item and have lawful access to it. United States v. Bradshaw, 102 F.3d 204, 211 (6th Cir. 1996) (applying Horton v. California, 496 U.S. 128, 136-37 (1990)). The officer need not come across the seized item inadvertently. Horton, 496 U.S. at 130-31. As a threshold matter, the Court

7

notes the marijuana and paraphernalia were of an obviously incriminating nature.² The issue before the Court is whether Investigator Beard was in a lawful position to view the items.

If Investigator Beard was legitimately outside Mr. Jordan's window in order to assist execution of the arrest warrant, he could lawfully seize any object in plain view so long as the object's incriminating character was immediately apparent. Horton v. California, 496 U.S. 128 (1990); United States v. Atchley, 474 F.3d 840, 850 (6th Cir. (2007); United States v. Bishop, 338 F.3d 623, 626 (6th Cir.2003). See e.g., United States v. Bradshaw, 102 F. 3d 204, 210-11 (6th Cir. 1996). The Supreme Court has explained that "[t]he seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity." Payton v. New York, 445 U.S. 573, 587 (1980).

The proof at the hearing established that Mr. Jordan's backyard was enclosed by a small fence. An unlocked gate provided access to the backyard from the carport at the side of the house. Testimony about the backyard was limited, but there was a child's swing-set. There were doors from the house to the backyard. A fenced backyard such as Mr. Jordan's is within the curtilage of the residence and therefore receives Fourth Amendment protection. Causey v. City of Bay City, 442 F.3d 524, 529 (6th Cir. 2006) (citing United States v. Jenkins, 124 F.3d 768, 772-73 (6th Cir. 1997). Thus, Attorney Sallee's assertion that Investigator Beard "had no right to walk up and look into the windows" from the backyard may be accurate absent a warrant or exigent circumstance. Here,

---

² Here, however, the officer did not physically seize the items after observing them through the window. Instead, he added his observation to an affidavit in support of a search warrant. The items were later seized pursuant to the search warrant. This distinction is of no legal consequence as the issue before the Court is the legitimacy of the actual observation of the objects, as the information was included in the affidavit in support of the search warrant application.

however, the officers were in the backyard as part of their cooperative effort to serve the arrest warrant.

The Court finds there was no Fourth Amendment violation in the officers' circling of Mr. Jordan's house in their attempt to locate and arrest him. The Court finds that the existence of the arrest warrant allowed the officers to walk through the carport and unlocked gate to set up station in the backyard while they waited for Mr. Jordan to respond to Agent Lewis' knock at the front door. Police officers must sometimes move away from the front door when they are attempting to contact the occupants of a residence. Investigator Beard and the other officers were attempting to arrest Mr. Jordan by approaching the front door of his home at midday. The officers were executing a valid arrest warrant.[3] The precautionary measure of posting one or more officers in the backyard area, under these circumstances, was reasonable. Accord Hardesty v. Hamburg Tp. 461 F.3d 646 (6th Cir. 2006) (officers' decision to proceed around the house to seek out a back door was within the scope of the knock and talk investigative technique and did not violate the ;1215;1215Fourth ;1216;1216Amendment). The Court must next consider whether, given his lawful position in the backyard, the Fourth Amendment permitted Investigator Beard to look into the window.

Where the initial intrusion that brings the police within plain view of such an article is supported by a warrant, the seizure is ;4158;4158legitimate. Investigator Beard testified that he looked into the apparently undraped window for the sake of his own safety. Investigator Beard was stationing himself in the backyard of a residence before a knock at the front door. The Court finds

---

[3] Aside from the instant challenge, there is no other suggestion of improper conduct on the part of this arrest team. The Court observes that the officers waited for Mr. Jordan to return home when no one came to the door. Such is the deference to an arrest warrant, that had they reasonably believed Mr. Jordan was inside and refusing to come to the door, an arrest warrant founded on probable cause imbued limited authority to enter the residence and arrest him, to include, after due demand, to break the outer or inner door. U.S. v. Alexander, 346 F.2d 561 (6th Cir. 1965).

it was a reasonable and permissible precaution to take a look inside the window immediately adjacent to his position.  See Kyllo v. United States, 533 U.S. 27, 32 (2001) ("visual observation is no 'search' at all"); Arizona v. Hicks, 480 U.S. 321 (1987) (truly cursory inspection, which involves merely looking at object that is already exposed to view, is not a search for purposes of Fourth Amendment); United States v. Shields, 978 F.2d 943, 944 (6th Cir. 1992) (officer approaching door to speak with occupants legitimately saw marijuana in plain view;1128;1128, growing in the front room of ;1136;1136house); United States v. Harris, 158 Fed.Appx. 719, 722, 2005 WL 3448282, *3 (6th Cir. 2005) (police could take into account, and act upon, an open-door view of a home in obvious, extreme disarray); Johnson v. Abramajtys, 951 F.2d 349, 1991 WL 270829, *1 (6th Cir. 1991) (legitimate view by officers of two people sitting in a living room through sheer curtain on the front ground floor window, just before knocking on the door and announcing they were police). Cf., United States v. Daoust, 916 F.2d 757, 758 (1st Cir. 1990) (if front door is inaccessible, "there is nothing unlawful or unreasonable about going to the back of the house to look for another door, all as part of a legitimate attempt to interview a person"); Rogers v. Pendleton, 249 F.3d 279, 289 (4th Cir.  2001)(holding that, ordinarily, there is no Fourth Amendment violation when police "knock on a residence's door or otherwise approach the residence seeking to speak to the inhabitants"); United States v. Anderson, 552 F.2d 1296, 1300 (8th Cir. 1977) (agents' action in proceeding to the rear after receiving no answer at the front door "was not so incompatible with the scope of their original purpose that any evidence inadvertently seen by them must be excluded as the fruit of an illegal search."); United States v. Garcia, 997 F.2d 1273, 1279 (9th Cir. 1993) ("security check" of backyard by police attempting to contact resident did not implicated Fourth Amendment);  United States v. Wheeler, 641 F.2d 1321, 1327 (9th Cir. 1981) (officer was acting

with a legitimate purpose when he looked over a fence intending to call out to the defendant and then spotted contraband in the yard); United States v. Hersh, 464 F.2d 228 (9th Cir.), cert. denied, 409 U.S. 1008 (1972) (officers walking up to the front door of a house can look inside through a partially draped open window without conducting a Fourth Amendment search); United States v. Freeman, 426 F.2d 1351, 1352-53 (9th Cir. 1970) (no search when officers spotted marijuana in plain view at the rear of an apartment after climbing a stairway which provided access to both the rear and front of eight second floor apartments).

The Court finds that Investigator Beard was lawfully present in Mr. Jordan's backyard when he observed marijuana and drug paraphernalia in plain view. This observation validly supported probable cause found by the state magistrate who later issued the search warrant for the premises.

### III: CONCLUSION

For the reasons stated herein, the Court's recommendation is that William Jordan's Motion to Suppress and Request for Disclosure of Pertinent Reports, **[Doc. 63]**, be **DENIED**.[4]

    Respectfully submitted,

      s/ H. Bruce Guyton
    United States Magistrate Judge

---

[4] Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see also Thomas v. Arn, 474 U.S. 140 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).